**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| AMANDA CARPENTER, Mother of | : | |
| Minor  Child, M.S., of Mark Eugene Simms, | : | |
| 84 State St | : | |
| Jackson, OH 45640 | : | CIVIL ACTION NO.  20cv2836 |
| | : | |
| | : | |
| and | : | |
| | : | JUDGE |
| MARK McCOWN, Administrator, | : | |
| Estate of Mark Eugene Simms, | : | |
| 311 Park Ave. | : | |
| Ironton, OH 45638, | : | |
| | : | MAGISTRATE JUDGE |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MATT CHAMPLIN, in his official capacity | : | |
| as Gallia County, OH Sheriff, | : | |
| 18 Locust St. | : | |
| Gallipolis, OH 45631, | : | |
| | : | |
| and | : | |
| | : | |
| KEVIN T. WERRY, in both his individual | : | |
| and official capacities as Gallia County, OH | : | |
| Jail Commander and Sheriff's Lieutenant, | : | |
| 18 Locust St. | : | |
| Gallipolis, OH 45631, | : | |
| | : | |
| and | : | |
| | : | |
| TODD BUMBALOUGH, in both his | : | |
| individual and official capacities as a | : | |
| Gallia County, OH Sheriff's Deputy and | : | |
| Jail Correctional Officer, | : | |
| 18 Locust St. | : | |
| Gallipolis, OH 45631, | : | |
| | : | |

and                                      :
                                         :
NICHOLAS CLAGG, in both his individual   :
and official capacities as a Gallia County, :
OH Sheriff's Deputy and Jail Correctional :
Officer                                  :
18 Locust St.                            :
Gallipolis, OH 45631,                    :
                                         :
        and                              :
                                         :
GARRETT HILL, in both his individual     :
and official capacities as a Gallia County, :
OH Sheriff's Deputy and Jail Correctional :
Officer                                  :
18 Locust St.                            :
Gallipolis, OH 45631,                    :
                                         :
        and                              :
                                         :
BROOKLYN STAPLETON, in both her          :
individual and official capacities as a  :
Gallia County, OH Jail Correctional Officer, :
18 Locust St.                            :
Gallipolis, OH 45631,                    :
                                         :
        and                              :
                                         :
GALLIA COUNTY, OHIO,                     :
c/o Harold Montgomery, David K. Smith,   :
and Brent Saunders, in their official    :
capacities as Gallia County Commissioners, :
18 Locust St. Rm. 1292                   :
Gallipolis, OH 45631,                    :
                                         :
                    Defendants.    :    **JURY DEMAND ENDORSED HEREON**


## FIRST AMENDED COMPLAINT

## I.    Preliminary Statement

1.      This civil rights, wrongful death, survivor, and loss of consortium action arises

from the deliberate indifference, recklessness, and gross negligence of Gallia County Jail

correctional officers, administrators, and policymakers which foreseeably increased the pain and anxiety and then caused the death of Mark Eugene Simms, a pre-trial detainee in their custody, from his previously diagnosed medical condition of an abdominal aortic aneurysm, about which he informed jail staff on numerous occasions, including on his intake forms when he entered the jail, by direct communication to jail staff, and when Emergency Medical Services were called for his condition two days prior to his death, where experienced Emergency Medical Technicians ("EMTs") recommended his immediate transport to the hospital, and for which jail staff and administrators acted with deliberate indifference when they: (1) refused to transport him and signed for his non-transport and refusal of treatment under jail policy; (2) failed to monitor him for changes in his condition after instruction from EMTs to do so; and (3) repeatedly ignored his change in condition when he began vomiting and instead insisted he was making himself throw up; thus foreseeably increasing his pain and distress and causing his death and thereby violating his right to due process under the Fourteenth Amendment and their duties under the common law of the State of Ohio.

## II.  Jurisdiction and Venue

2.      This Court has jurisdiction by virtue of the Civil Rights Act of 1871, 42 U.S.C. § 1983; 28 U.S.C. §§ 1331 (federal question); 1343 (civil rights); and 1367 (supplemental jurisdiction).

3.      Declaratory, injunctive, equitable relief, compensatory, and, against officers sued in their individual capacity, punitive damages are sought pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 2201; 2202, and the common law of the State of Ohio.

4.      Costs and attorneys' fees may be awarded pursuant to the 42 U.S.C. § 1988; Fed. R. Civ. P. 54; and the common law of the State of Ohio.

5.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) and S.D. Civ. R. 82.1(b) because Defendants are located in Gallia County, Ohio, where the events giving rise to this action occurred.

## III.    Parties

6.      Plaintiff Amanda Carpenter is the mother of M.S., Mark Eugene Simms' minor daughter, age fifteen years, who brings a claim for loss of consortium on her behalf.

7.      Plaintiff Mark McCown brings this suit as the Administrator of Mark Eugene Simms' estate, as appointed by the Gallia County Probate Court on May 11, 2020, Case No. 20-201038.

8.      Defendant Matt Champlin is the Sheriff of Gallia County, Ohio; was elected as Sheriff in 2017; is being sued in his official capacity; is a "person" under 42 U.S.C. § 1983; acted under color of state law at all times relevant to this action; is responsible under R.C. § 341.01 and the policies, practices, and customs of Defendant Gallia County for keeping incarcerated persons safe in the Gallia County Jail and establishing policies and practices for monitoring and responding to the serious medical conditions of incarcerated persons, including known pre-existing conditions; and is responsible for employing, supervising, and training subordinate Jail personnel on those policies and practices.

9.      Defendant Gallia County Jail Commander Lt. Kevin Werry was delegated by Defendant Champlin responsibility for keeping incarcerated persons safe in the Gallia County Jail; establishing policies and practices for the operations of the Jail, including those on monitoring and responding to prisoners who are suffering from serious medical conditions; and is responsible for employing, supervising, and training subordinate Jail personnel on those policies and practices; is being sued in both his official and, due to his role in refusing to

transport Mark E. Simms to the hospital for his serious medical condition, individual capacities; is a "person" under 42 U.S.C. § 1983; and acted under color of state law at all times relevant to this action.

10. Defendant Todd Bumbalough is a Gallia County Sheriff's Deputy who serves as a Jail Correctional Officer; is a "person" under 42 U.S.C. § 1983; acted under color of state law at all times relevant to this action; is being sued in both his individual, due to his role in delaying medical treatment for Mark E. Simms, and official capacities; and is assigned by Defendants Champlin and Werry to implement the policies, practices, and customs of Defendant Gallia County for keeping incarcerated persons safe at the Gallia County Jail, including those on monitoring and responding to prisoners who are suffering from serious medical conditions; and received supervision and training from superiors on such policies and practices.

11. Defendant Nicholas Clagg is a Gallia County Sheriff's Sergeant who serves as a Jail Correctional Officer; is a "person" under 42 U.S.C. § 1983; acted under color of state law at all times relevant to this action; is being sued in both his individual, due to his role in delaying medical treatment for Mark E. Simms, and official capacities; and is assigned by Defendants Champlin and Werry to implement the policies, practices, and customs of Defendant Gallia County for keeping incarcerated persons safe at the Gallia County Jail, including those on monitoring and responding to prisoners who are suffering from serious medical conditions; and received supervision and training from superiors on such policies and practices.

12. Defendant Garrett Hill was a Gallia County Sheriff's Deputy who served as a Jail Correctional Officer; is a "person" under 42 U.S.C. § 1983; acted under color of state law at all times relevant to this action; is being sued in both his individual, due to his role in delaying medical treatment for Mark E. Simms, and official capacities; and was assigned by Defendants

Champlin and Werry to implement the policies, practices, and customs of Defendant Gallia County for keeping incarcerated persons safe at the Gallia County Jail, including those on monitoring and responding to prisoners who are suffering from serious medical conditions; and received supervision and training from superiors on such policies and practices.

13.     Defendant Brooklyn Stapleton is a Gallia County Jail Correctional Officer; is a "person" under 42 U.S.C. § 1983; acted under color of state law at all times relevant to this action; is being sued in both his individual, due to her role in delaying medical treatment for Mark E. Simms, and official capacities; and is assigned by Defendants Champlin and Werry to implement the policies, practices, and customs of Defendant Gallia County for keeping incarcerated persons safe at the Gallia County Jail, including those on monitoring and responding to prisoners who are suffering from serious medical conditions; and received supervision and training from superiors on such policies and practices.

14.     Defendant Gallia County, Ohio, reached through its Board of County Commissioners, who are named only in their official capacity as the policymaking and legislative body of the County and sue-and-be-sued status under R.C. § 305.12, is a unit of local government established under the laws of the State of Ohio with the ultimate authority to adopt Gallia County policies, practices, and customs for keeping incarcerated persons safe in the Gallia County Jail and established policies and practices for monitoring and responding to prisoners suffering from serious medical conditions; and supervision and training subordinate Jail personnel on such policies and practices; and, at all times relevant to this complaint, was a "person" under 42 U.S.C. § 1983 and acted under color of state law.

**IV.    Facts**

15.     On December 12, 2018, Mark Eugene Simms ("Mr. Simms") was arrested and booked into the Gallia County Jail for two counts of failure to appear in court for non-support of children charges.

16.     Mr. Simms' bond was set at $2,000 ($1,000 for each count), which he could not afford to pay, nor could he afford to pay ten percent ($200) for a bondsman, so he remained in jail as a pre-trial detainee.

17.     Mr. Simms went through the Jail's standard intake process, including filling out a booking form which asked about his medical history, prescriptions, and current physical and mental state.

18.     On the booking form, Mr. Simms indicated, in response to a question asking about "previous surgery or other medical issues," that an "[a]rtery in stomach needs surgery."

19.     Upon booking, Mr. Simms was not asked additional follow-up questions about the artery in his stomach or why it required surgery and was put into general population in "C Block" with other inmates.

20.     During the time he was incarcerated, Mr. Simms discussed with other inmates and jail staff the fact that he had an enlarged artery which  was about to burst in his stomach , telling them that  he needed surgery to fix the enlarged artery but was unable to have the surgery due to being arrested.

21.     During his incarceration, Mr. Simms complained constantly to jail staff and other inmates of severe stomach pain due to the artery.

22.     On December 13, 2018 around 11:00 p.m., Mr. Simms' abdominal pain became increasingly severe, and he complained of the issue to Defendant Deputy Garrett Hill ("Deputy Hill"). He informed Deputy Hill that he had been seen in the hospital for "an artery about to

bust" prior to going to jail and that he had left against medical advice without having necessary surgery. During this conversation, Deputy Hill did not observe Mr. Simms vomiting or evidence of vomiting.

23.     Shortly following their conversation, Deputy Hill pulled Mr. Simms from his cell due to his complaints of severe abdominal pain and enlarged artery.

24.     Around midnight, Defendant Correctional Officer Brooklyn Stapleton ("CO Stapleton") was instructed by Deputy Hill to contact the Officer in Charge, Defendant Sergeant Nicholas Clagg ("Sergeant Clagg"), regarding Mr. Simms' complaints of stomach pain and the artery in his stomach. Deputy Hill advised CO Stapleton that Mr. Simms checked himself out of the hospital prior to being arrested "against medical advice."

25.     Sergeant Clagg arrived at the Jail and questioned Mr. Simms about his complaint, asking if it was serious, and Mr. Simms responded he was experiencing stomach pain and informed him about the artery in his stomach, specifically noting that it was "about to explode."

26.     Mr. Simms informed Sergeant Clagg that he knew of this condition because he was in the hospital for it one month prior.

27.     Around the same time, Defendant Deputy Todd Bumbalough ("Deputy Bumbalough") (who was not scheduled to work) stopped by the Jail. Mr. Simms spoke with Deputy Bumbalough at that time and told Deputy Bumbalough about the issue with his artery.

28.     Sergeant Clagg instructed CO Stapleton to call an emergency squad. CO Stapleton did so and informed dispatch on the phone that an inmate had complained of an artery in his stomach that was about to bust. She also informed dispatch that the inmate had signed out of the hospital a few weeks prior against medical advice after being diagnosed with an abdominal aneurysm.

29.     Around 12:46 a.m. on December 14, 2018, Gallia County Emergency Medical Services ("EMS") responded to the call from CO Stapleton. EMS Personnel examined Mr. Simms in the booking area of the Jail.

30.     Sergeant Clagg reported he left the Jail prior to EMS arrival.

31.     In fact, according to correctional officers present at the time of EMS arrival, Sergeant Clagg, CO Stapleton, Deputy Hill, and Deputy Bumbalough were all present when EMS personnel were treating Simms.

32.     During their examination, Emergency Medical Technicians (EMTs) decided not to palpate Mr. Simms' stomach as that movement alone could cause the artery to rupture.

33.     Gallia County EMS informed CO Stapleton that Mr. Simms' vitals were within "normal limits" but recommended he be taken to the hospital for further evaluation.

34.     EMS also informed CO Stapleton that Mr. Simms needed a CAT scan and lab work to either confirm or rule out a weak artery, and that if a weak artery existed it could rupture at any time.

35.     CO Stapleton replied that, per Jail policy, she needed to contact Sergeant Clagg and/or Jail Commander Kevin Werry ("Jail Commander Werry") to determine what action would be taken for Mr. Simms, as Sergeant Clagg and/or Jail Commander Werry had the authority to allow inmates to be transported to the hospital.

36.     CO Stapleton notified Sergeant Clagg that Mr. Simms' vitals checked out per EMS, and Clagg instructed her that Mr. Simms was to be monitored rather than transported.

37.     Jail Commander Werry and Sergeant Clagg refused to have Mr. Simms transported to the hospital, at least in part because they did not believe they had enough correctional officers on staff to accompany Mr. Simms.

38.     According to the EMTs on scene, an "older" male GCSO Deputy informed them that an "effort" would be made to transport Mr. Simms to the hospital "later that morning when manpower permitted," or words to that effect.

39.     A superior officer instructed CO Stapleton to sign the Gallia County EMS form refusing treatment and transport on behalf of Mr. Simms.

40.     CO Stapleton assured EMTs that, per Sergeant Clagg, Mr. Simms would remain at the Jail under "medical observation" and that Jail staff would contact Gallia County EMS if there was any change in Mr. Simms' condition; EMTs noted this information for their records.

41.     Per Gallia County Jail policy, inmates were not permitted to sign their own refusal of transport or treatment forms when presented such options by EMS.

42.     Gallia County Jail policy and/or its standard practice or custom required a correctional officer to sign the refusal of transport or treatment forms after contacting a superior officer for a directive on whether the inmate was going to be transported or treated.

43.     Per Jail policy and/or its standard practice or custom, superior officers, including the Officer in Charge and/or Jail Commander, retained discretion on whether or not an inmate's serious medical needs were to be treated by EMS.

44.     Gallia County Jail policy and/or its standard practice or custom also permitted Jail staff to contact the dispatch office, or road patrol to determine if an officer unit is available to transport the inmate to the hospital.

45.     Sergeant Clagg ordered that Mr. Simms to be monitored closely, checked on every thirty minutes to one hour, and any changes in his condition be reported to him. He also ordered that day shift and Jail Commander Werry be informed about monitoring Mr. Simms.

46. Despite being told to monitor Mr. Simms and inform the next shifts about the situation, Correctional Officers, including Ryan Perry ("CO R. Perry"), who worked the next day on December 14, 2018, did not receive a briefing about Mr. Simms prior to the start of their shift and did not know he was seen by EMS or had to be monitored.

47. Sometime between 3:00 p.m. and 5:30 p.m. on December 14, 2018, CO R. Perry removed Mr. Simms from C Block because he was vomiting "everywhere."

48. CO R. Perry placed Mr. Simms in the booking area, where he vomited "a few more times."

49. CO R. Perry felt the vomit "wasn't nothing like really to be concerned about" and moved Mr. Simms to "B Block" which was larger, square footage-wise, than C Block; however, Mr. Simms was removed again by CO R. Perry when he was threatened by another inmate for vomiting on a mat inside the cell.

50. CO R. Perry placed Mr. Simms in a solitary cell, "D Block", until he could be medically evaluated. At the time CO R. Perry was placing Mr. Simms in a solitary cell, Mr. Simms requested to CO R. Perry that he be seen in the hospital.

51. CO R. Perry informed the Jail's Nurse Practitioner, Betsy Canaday ("NP Canaday"), about Mr. Simms' vomiting, who ordered him a "detox packet," without examining him personally. She did so on the basis that CO R. Perry informed her that Mr. Simms reported he was suffering from Suboxone withdrawal and might also have Hepatitis A.

52. Despite working third shift on December 13, 2018 and knowing of Mr. Simms' abdominal pain and enlarged artery, CO R. Perry did not inform NP Canaday of those known conditions or the visit from EMS earlier that day.

53.     Against established Jail policy, Jail staff failed to inform NP Canaday that Mr. Simms was seen by EMS earlier that day.

54.     Mr. Simms continued his verbal requests to be transported to the hospital; indeed, his complaints from D Block were so loud that inmates in C Block overheard him making these requests.

55.     While working first shift on December 15, 2018, Deputy Bumbalough was informed that Mr. Simms was moved to D Block for "safety reasons" and that he was vomiting in a cell block, which caused the other inmates to complain.

56.     Deputy Bumbalough knew that vomiting was a change in Mr. Simms' condition since EMS were there the previous day when he was present. Despite this, he failed to report this change to superior officers or EMS, and he did not interact with Mr. Simms at all that shift, even upon learning of his change in condition.

57.     Deputy Bumbalough believed Mr. Simms needed to remain in D Block merely because he was a "small guy" who was being "bullied," and he deliberately ignored how the vomiting could be a further indication of his serious medical condition and its worsening.

58.     Deputy Bumbalough again worked day shift on December 16, 2018, where, around 11:45 a.m., he walked an inmate, Brandon Cox ("Inmate Cox"), to a cell in C Block, which was located directly next to Mr. Simms' cell in D Block.

59.     Mr. Simms' cell was so close to Inmate Cox's cell that both Inmate Cox and Deputy Bumbalough heard Mr. Simms moaning for help.

60.     Deputy Bumbalough failed to timely check on Mr. Simms after he heard him asking for help.

61.     Around 12:30pm, Deputy Bumbalough passed lunch trays out to the inmates, including Mr. Simms in D Block.

62.     When Deputy Bumbalough spoke with Mr. Simms, he asked if Mr. Simms "got sick on his floor," or words to that effect, as Mr. Simms' vomit was obvious.

63.     Mr. Simms replied he had been vomiting.

64.     Rather than inform superior officers or EMS about Mr. Simms' obvious change in condition, Deputy Bumbalough simply asked Mr. Simms if he wanted to clean up his own vomit after he was done with lunch.

65.     When Deputy Bumbalough returned to Mr. Simms' cell after lunch, he observed Mr. Simms reportedly sleeping; Mr. Simms did not respond when Bumbalough asked if he wanted his lunch tray removed.

66.     Between 1:00 p.m. and 1:30 p.m., Deputy Bumbalough again went to Mr. Simms' cell to advise him his mother arrived for a visit; at this time, Deputy Bumbalough again observed new vomit in the cell.

67.     Rather than report to superior officers or EMS about Mr. Simms' repeated vomiting, which presented a change in his condition, he escorted Mr. Simms to the visitation booth.

68.     After a two-minute visit, Mr. Simms asked Deputy Bumbalough if he could return to his cell because he was not feeling well. Deputy Bumbalough then escorted Mr. Simms back to his cell.

69.     Shortly thereafter, Deputy Bumbalough left Mr. Simms the "detox packet" that NP Canaday had prescribed the previous day.

70.     Around 2:00 p.m., Deputy Bumbalough took an inmate to C Block to use the restroom.

71.     During this time, Inmate Cox and other inmates in C Block informed Deputy Bumbalough that Mr. Simms was continuing to moan for help from his cell and sounded as though he was in pain.

72.     In response to the inmates' reports of Mr. Simms' moaning for help, Deputy Bumbalough laughed, joked that Mr. Simms was gagging himself with his finger to force vomit, and commented that Mr. Simms was not actually sick.

73.     Deputy Bumbalough deliberately ignored these reports and refused to check on Mr. Simms, even though he knew of a direct order from superiors that Mr. Simms' condition was to be closely monitored and any change in condition properly reported to superiors and/or EMS.

74.     Contrary to established Jail policy, Deputy Bumbalough failed to document in the Shift Log Report that Mr. Simms was sick.

75.     When second shift arrived at 3:00 p.m., Correctional Officers received a briefing from the prior shift, which did not mention Mr. Simms.

76.     Deputy Hill, upon arrival for his shift at 3:00 p.m., asked Deputy Bumbalough directly why Mr. Simms was in D Block, and Bumbalough then revealed that Mr. Simms had been vomiting.

77.     Upon learning of the vomiting incidents, Deputy Hill did not report Mr. Simms' change in condition to superior officers or EMS.

78.     Early in his shift, Deputy Hill was informed by Correctional Officer Debra Smith ("CO Smith") that Mr. Simms' mother had posted his bond. Upon learning this, Deputy Hill

conducted a headcount and then went to retrieve Mr. Simms' belongings and a mop to clean up D Block.

79.     Because he had learned that Mr. Simms was to be released, Deputy Hill declined to check on him or report his change in health status to either his superiors or EMS upon learning of his change in condition.  Instead, he acted immediately to get Mr. Simms out of the jail as soon as possible to shift responsibility for Mr. Simms' medical condition from the Jail to Mr. Simms and his family.

80.     At 3:31 p.m., Mr. Simms put on his socks and shoes as he was getting ready to be released.

81.     Two minutes later, Deputy Hill opened Mr. Simms' cell door. At 3:34 p.m., Mr. Simms slipped in his vomit and landed on a bench in the cell; after falling, he began to vomit, spitting liquid out of his mouth.

82.     Deputy Hill sat Mr. Simms upright to prevent him from aspirating on his vomit and moved him out of his cell to perform chest compressions.

83.     Deputy Hill was yelling to CO Smith for assistance; she did not respond immediately and Deputy Hill, while performing chest compressions, instructed inmates in C Block to make noise to get her attention, which worked after several minutes.

84.     At 3:40 p.m., CO Smith went to the office and called 911 and stated an inmate slipped and had a possible head injury.

85.     At 3:42 p.m., Deputy Hill removed an inmate, Chrystian Johnson ("Inmate Johnson"), from C-Block to help Mr. Simms. Inmate Johnson helped Defendant Hill carry Mr. Simms to the booking area, where they performed chest compressions.

86.     At the same time, CO Smith called 911 again and advised Mr. Simms was not breathing during these efforts; at that point, he had vomited a considerable amount of "black" liquid.

87.     At 3:44 p.m., EMS arrived and took over chest compressions to which Mr. Simms did not respond.

88.     Upon their arrival, EMTs were informed that Mr. Simms had been vomiting all day.  They did not observe any obvious bodily injuries on Mr. Simms.

89.     After Mr. Simms did not respond to chest compressions, EMTs loaded Mr. Simms onto a gurney and carried him out to the ambulance where further life-saving efforts were attempted.

90.     Shortly thereafter, after several unsuccessful attempts by EMTs to revive him, Mr. Simms was pronounced dead.

91.     Mr. Simms' autopsy revealed his manner of death was natural, with his cause of death reported as arteriosclerotic cardiovascular disease with methamphetamine intoxication contributing.

92.     The arteriosclerotic cardiovascular disease, due to or as a consequence of severe coronary artery disease, was reported as the immediate cause of death, which caused his death within minutes of its onset.

93.     The supplementary medical certification listed methamphetamine intoxication as an "other significant condition[ ] contributing to death but not resulting in the underlying cause" of the arteriosclerotic cardiovascular disease.

94.     Mr. Simms' serious medical condition resulted in his death because he was not treated in a timely and effective manner.

95.     Even if use of drugs contributed to his death, Mr. Simms' need for treatment and transport to the hospital was obvious to Jail staff far before any such use may have occurred.

96.     Mr. Simms' death was caused by the deliberate indifference of Defendants to his serious medical needs when they refused to transport him to the hospital against medical advice; failed to inform its staff on incoming shifts about Mr. Simms' need to be regularly monitored; failed to so monitor him; ignored his obvious change in condition arising when he began vomiting less than twenty-four hours after EMS recommended his transport and instructed Jail staff to advise them of any changes in his condition; made fun of him for pretending to be sick by "gagging" himself with his finger; repeatedly refused to check on him after hearing him moan for help and being advised of his calls for assistance by multiple inmates; and rushing to shift responsibility for his serious medical condition from the jail to Mr. Simms and his family upon learning of his bond being posted rather than check on him after learning about his rapid change in condition.

97.     But-for the deliberate indifference of Defendants to Mr. Simms' serious medical condition, causing a significant delay in treatment, Mr. Simms' could have been treated at the hospital for the enlarged artery and survived.

98.     The Jail ostensibly had policies in place that inmates with serious medical needs should be examined and, when necessary, taken to the hospital for treatment.

99.     The way the Jail implemented its policies and trained and supervised its staff on those policies caused their deliberate indifference to Mr. Simms' serious medical needs.

100.    At all times material to this complaint, the Jail had a policy providing for its jail staff and administrators to refuse transport to the hospital for inmates with serious medical needs even where EMS recommends such transport.

101. Defendants Sheriff Champlin and Jail Commander Werry never adequately trained or directed Jail staff about the need to investigate and act upon signs of inmates being seriously sick, such as repeated instances of vomiting and a known prior diagnosis of an enlarged artery about to bust.

102. Had Defendants Sheriff Champlin and Jail Commander Werry trained, directed, or supervised Jail staff in recognizing, investigating, and acting upon signs of inmates being seriously sick, Mr. Simms would not have suffered pain and anxiety from delayed medical treatment and would not have died due to his serious medical condition.

103. Any reasonably competent Jail Commander or Correctional Officer would have known that an inmate who disclosed as serious a medical condition and presented as great a need for transport to the hospital as Mr. Simms should have been immediately transported to the hospital upon instruction by EMS to do so and/or should have been closely monitored after transport was not authorized by jail superiors, with any change in condition reported, and that appropriate care should have been taken upon observing a change in condition, and that failing to do so would constitute deliberate indifference in violation of the inmate's constitutional rights.

104. The County and the Jail and its administrators were on notice before the events resulting in Mr. Simms' suffering of pain and anxiety and his death that prisoners with serious medical conditions, including drug addiction, depression, and suicidal ideation, were being inadequately treated.

105. The County and the Jail and its administrators were on notice before the events resulting in Mr. Simms' suffering of pain and anxiety and his death that Correctional Officers were flouting policies, ignoring training, and failing to ensure that prisoners were being adequately treated for their serious medical conditions.

106.     The failure of the County and the Jail and its administrators to train and supervise Correctional Officers in a way that ensured prisoners were being adequately treated for their serious medical conditions contributed to the pain, anxiety, and death of Mr. Simms.

107.     It was readily foreseeable to the County and the Jail and its administrators, prior to Mr. Simms' death, that, unless it provided training, adopted a policy, and/or effectively supervised Jail staff to ensure that they were implementing and training a policy on recognizing, investigating, and acting upon inmates' serious medical needs, inmates who suffered from serious medical needs would suffer injuries, pain, anxiety, and have fatal or near-fatal experiences in circumstances indicating a need for treatment of those serious medical conditions.

108.     The Defendants sued in their individual capacities are not entitled to Qualified Immunity for the acts/omissions set forth in this complaint.

109.     The law was clearly established in the Sixth Circuit and other Federal Circuits at the time of Mr. Simms' incarceration that deliberate indifference to an inmate's serious medical needs violates an inmate's constitutional rights.

110.     Defendants' conduct shocks the conscience, violates the standards of decency in an evolving society, and betrays the trust that inmates and the public place in jail staff to provide proper medical care to those over whom they exercise custody.

111.     As a direct and proximate result of Defendants' deliberate indifference and willful, wanton, reckless, and grossly negligent acts and omissions, Mr. Simms suffered the ultimate due process violation, the deprivation of his life.

112.     As a direct and proximate result of Mr. Simms' wrongful death, his survivors and heirs have suffered permanent damages, including but not limited to grief, depression, and severe emotional distress; loss of support services and society, including loss of companionship, care,

assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, as well as the loss of prospective inheritance; and the expenses of funeral bills and/or medical treatment.

113.    As a direct and proximate result of Defendants' deliberate indifference and willful, wanton, reckless, and grossly negligent acts and omissions, Ms. Simms needlessly suffered pain and anxiety.

114.    As a direct and proximate result of Mr. Simms' wrongful death, his minor child has suffered loss of consortium, including but not limited to, the services, love, and affection of her father.

## V.    Claims

### A.    Count I: Deprivation of Due Process under the Fourteenth Amendment

115.    Paragraphs 1 through 114 above are realleged and incorporated herein.

116.    By their deliberate indifference to Mr. Simms' serious medical condition, refusal to transport him to the hospital against medical advice, failure to monitor him after direct order to do so, failure to report known changes in his condition after direct order to do so, and ridiculing and ignoring his obvious symptoms of physical distress, Defendants Jail Administrators, Deputies, and Correctional Officers deprived Mr. Simms of his liberty – the right to be incarcerated without deliberate indifference to his serious medical needs – in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

117.    By their failing to adopt policies,  train, and/or supervise COs on the foreseeable need to closely monitor inmates and/or report changes in condition to superiors and/or EMS pursuant to  a medical order; investigate signs of inmates being sick or exhibiting changes in condition; and/or to transport to a hospital for advanced treatment inmates who are suffering

from a serious medical condition, Defendants Sheriff and Jail Commander caused the deprivation of Mr. Simms' liberty – to be incarcerated without deliberate indifference to his serious medical needs – in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and thereby causing his wrongful death.

**B.**     **Count II: Wrongful Death**

118.    Paragraphs 1 through 114 above are realleged and incorporated herein.

119.    By their acts and omissions, Defendants sued in their individual capacities caused Mr. Simms' wrongful death, resulting in damages recoverable under R.C. 2124.02.

**C.**     **Count III: Gross Negligence**

120.    Paragraphs 1 through 114 above are realleged and incorporated herein.

121.    The Defendants sued in their individual capacities are liable  for their willful, wanton, and reckless acts and/or omissions, including but not limited to, acting with deliberate indifference to Mr. Simms' serious medical needs, failure to adequately monitor Mr. Simms for changes in condition, failure to report known changes in condition, failure to provide prompt medical treatment, failure to timely transport him to the Hospital on the orders of Gallia County EMS, and willful conduct in delaying Mr. Simms' treatment when he began vomiting and instead deliberately ignoring and ridiculing him for "making" himself throw up.

**D.**     **Count IV: Loss of Consortium**

122.    Paragraphs 1 through 114 above are realleged and incorporated herein.

123.    By their actions and inactions, Defendants sued in their individual capacities caused Mr. Simms' minor child to suffer loss of consortium.

**VI .**    **Prayer for Relief**

WHEREFORE, Plaintiffs are entitled to and pray for the following relief:

A.      a declaration that Defendants, jointly or severally, have violated Mark Eugene Simms' civil rights, and Defendants sued in their individual capacity recklessly inflicted a wrongful death on him, were grossly negligent causing him pain and anxiety and death, and imposed loss of consortium on his children;

B.      order such equitable relief as will make Plaintiffs whole for Defendants' unlawful conduct;

C.      enjoin Defendant from operating the Gallia County Jail without adequate training and/or supervision of subordinate employees to adequately monitor and respond to prisoners suffering from serious medical conditions;

D.      compensatory damages in an amount exceeding $75,000, and, against Defendants sued in their individual capacity, punitive damages in excess of $75,000;

E.      prejudgment and postjudgment interest:

F.      costs and reasonable attorneys' fees; and

G.      such other relief as the Court deems fair and equitable.

Respectfully submitted,


**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (614) 463-9780

By: /s/ *John S. Marshall*
John S. Marshall (0015160)
(*jmarshall@marshallforman.com*)
Edward R. Forman (0076651)
(*eforman@marshallforman.com*)
Madeline J. Rettig (0098816)
(*mrettig@marshallforman.com*)
Samuel M. Schlein (0092194)
(*sschlein@marshallforman.com*)
Helen M. Robinson (0097070)
(*hrobinson@marshallforman.com*)
MARSHALL & FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296

(614) 463-9790
Fax (614) 463-9780

Eleni A. Drakatos (0076269)
**YACOBOZZI | DRAKATOS, LLC**
1243 South High Street
Columbus, Ohio 43206
Phone: (614) 443-2800
Fax: (614) 443-2801
E-mail: edrakatos@ydlegal.com

## JURY DEMAND

Plaintiff demands a trial by jury on all issues and defenses triable to a jury.

By: /s/ *John S. Marshall*
John S. Marshall (0015160)